Curia, per Withers, J.
The defendants are convicted under the Act of 1841, which punishes as for a misdemeanor, any person who shall “ unlawfully whip or beat any slave, (not under his or her charge) without sufficient provocation, by word or act.”
The defence was rested upon their rights as patrol; and it proceeds upon the idea that they we.re engaged in dispersing an unlawful assembly of slaves; for the notion is preposterous that the slaves whipped were “ under the charge” of the patrol who were punishing them, in the sense of the Act.
The slaves who were whipped were on the premises of a citizen, himself a slave-owner, by his consent, and with tickets from their masters. The occasion was a perfectly innocent one, even meritorious ; foi Hunter’s negro woman had obtained his permission to call in assistance towards the construction of a quilt for her bed, or some bed ; and it'is to be hoped that no master in the State would have denied such an indulgence when he had no motive to suspect that it was contrived, to cover up some evil design. How many of us have permitted to our slaves file enjoyment of a wed *24 ding party and ceremony, in imitation of the custom of the higher class, and even contributed liberally, to the good of the occasion? It is surely no novelty among slave-ownerSj that by consent of all parties, one slave should obtain the assistance of his neighbor to gather his little crop, even though it be on a Saturday night, or to erect or improve his cabin.' It would be painful to find that the law forbids masters to permit or to encourage the slave in honoring the humble virtues that may be consistent with his condition, wlu^her the same may take the direction of social relations and intercourse among themselves, or the advancement of household comforts. The true spirit of our law does not aim at such an end, where the mode of attaining it presents no conflict with the interests, the peace and security of the public. These, undoubtedly, must be regarded at all hazards ; and no police regulations, subserving that high policy, can be justly branded as cruel or tyrannical. To ascertain whether the slaves punished by the defendants were caught in the violation of any law, we must look to the statutes.
Our fundamental code, now time-honored, is that of 1740. It was enacted soon after a violent, barbarous, and somewhat bloody servile outbreak at Stono. Not a few of its provisions took their hue from the exigency of the occasion, and that it has faded somewhat in the lapse of time, is only the usual inevitable consequence of all police systems, in the shape of positive terms, which cannot have the quality to Ijeep up with the advancement of a community. An attentive examination, however, of our slave law, will show that there are few occasions where a slave is supposed to need the interposition of police discipline, whether wielded by the private or the public arm, when his errand from home is known to his owner, and permitted by him in writing. By the 7th section, a magistrate was authorized, personally or by warant to another, to call the posse and disperse “ any assembly or meeting of slaves, which may disturb the peace or endanger the safety of his Majesty’s subjects.’’ By the 43d section, any person was authorized to apprehend and chastise, within a limit, a body of “ men slaves exceeding seven in number,” who were seen “ to travel together in any high road.” How often this section would work mischievously at this day, if indiscreetly enforced according to the letter, will occur to every body.
But the 36th section of the same Act is supposed to be the only one that can have the semblance of application to this case. It is too long to be incorporated here. But the object ■ of the provision was declared to be the safety of the Pro-wince. It would seem simply ridiculous to suppose that the safety of the State or any of its inhabitants, was implicated by such an assemblage as that at Hunter’s, composed of a *25 few males; more females ; with tickets from their owners; in the kitchen of a citizen, by his consent; not impudent nor, disorderly, by the admission of the defendants ; assembled at a quilting, and no evidence of a carousal by eating or drinking. The said section declared, that due care should be taken to restrain the “ wanderings and meetings of ne-groes and other slaves” — “ more especially on Saturday nights, Sundays and other holidaysand the using and carrying certain dangerous weapons, drums, horns, and other loud instruments ; and to prevent the meeting of negroes under such circumstances, anybody was authorized to arrest and disarm one out of his master’s premises, “not being on lawful business, and with a letter from his master, or a ticket, or not having a white person with him.” This was all designed as precaution, to prevent such wanderings and meetings before denounced. Then follows the material provision, to wit: “ And whatsoever master, owner or overseer shall permit or suffer his or their negroes or other slave or slaves, to beat drums, blow horns, or use any other loud instruments; or whosoever shall suffer and countenance any public meeting or feastings of strange negroes or slaves in their plantations, shall forfeit,” <fcc.
We cannot perceive that the assembly of negroes as before described, with which these defendants interfered, can be made to auswer the terms of the foregoing quotation, according to their usual imp'ort; and still less, when taken in connection with what was recited as the danger to be guarded against, the mischief to be remedied. Wé do not mean to affirm (what seems to have been the circuit Judge’s impression) that if it had been such an assembly, the patrol may not have dispersed it, notwithstanding the liability to a pecuniary penalty of him who suffered and encouraged it. Nor do we mean to trench in any degree, upon the vigorous administration by the patrol, of the important police power intrusted to them, within the orbit prescribed for their action. Let them exercise with judicious freedom, the power to disperse unlawful assemblies, as they are expressly impowered to do by the 13th section of the patrol law, in relation to slaves, free negroes, mulattoes and mestizoes ; such, for example, as are found in disorderly house's; such as are described in the 11 section of that Act; but a judicious freedom of administration in our police law for the lower order, must always have respect to the confidence which the law reposes in the discretion of the master, the presence of the proprietor, his loyalty to the sympathies and the policy that involve our common interests, peace and safety. Let the patrol always act in the spirit that should guide the discreet, sedate, intelligent and humane owner of slaves, and they will find the judicial arm of the government nerved to sus *26 tain them, if indeed it could be presumed that, in such case, they WOuld ever need it. Tlius guided, they may often find occasions — no doubt they will — to overlook a harmless vio-]at¡on¡ a venial transgression of the strict letter — to construe in a spirit of mildness — to concede something to the sacredness of domicil, the quiet of a family at the midnight hour— to recognize what is eminently the negro’s quality, the love of social intercourse, with no object beyond it, and no time to indulge it but the night; to distinguish between the premises of the quiet, orderly citizen, and of him whose very business of life is to corrupt the slave in his morals and his allegiance. This very case may illustrate what is meapt. Supposing that this assembly was an unlawful one, could it not have been dispersed just as readily and effectually without flogging, as with it ? Why, therefore, chastise negroes who seem to have had no idea that they were doing wrong; who were at the place where they were found, by the consent and written license of their master; when the proprietor came out to add his own authority and consent; when, as we presume, he was not a suspicious person, or engaged in suspicious traffic ?
We are mindful, however, that the Statute of 1740, in the 53d section, enjoins that every portion of it “ shall be construed most largely and beneficially for the promoting and carrying into execution this Act, and for the encouragement and justification of all persons to be employed in the execution thereof;” and since we are persuaded that it is probable these defendants had no deliberate purpose to commit an outrage upon the rights of others, we are gratified to learn from the Judge who presided on circuit, that it has not been his design to inflict an exemplary punishment.
As already intimated, it would be agreeable to us to be always able to sustain so useful and important a body as the patrol; but perceiving no error in the conviction of the present parties, we are constrained to order that their motion be dismissed.
Evans, Wardlaw and Frost, JJ. concurred.

Motion refused.